Message
_____

| | |
|---|---|
| **From:** | Jeff Ianello ████████████ |
| **Sent:** | 4/12/2021 11:01:31 PM |
| **To:** | Jim Van Stone ██████████████████ ]; Chris Sheap ██████████████ ]; Adam Heintz |
| | ██████████████ ] |
| **CC:** | Danielle du Toit ██████████████ ]; Russ D'Souza ████████████ ]; Michael McCabe |
| | ██████████████ ] |
| **Subject:** | Contract Draft |
| **Attachments:** | Monumental Sports & Entertainment Exclusive Ticket Sales Services Agreement (SG 4.12.21).docx |

Jim/Chris/Adam,

Per one of our next steps, we have completed the draft of our standard contract agreement. This draft is attached. Our goal is to continue to work through diligence with your team while parallel pathing an initial red line. It will then be VERY time-efficient to slot in the key economic terms, that we mutually agree to, and start the project.

Thank you for all of your support and congrats on welcoming fans back.


--
Jeff Ianello
EVP, Client Partnerships
SeatGeek Enterprise

████████████████████

████████████

**[EXTERNAL EMAIL]**
**This email originated from outside of MSE. Do not click links or open attachments unless you recognize the sender and know the content is safe.**
                                                                                                    *- MSE Helpdesk*

No. 1:24-cv-03973-AS
Defs' Trial Exhibit
**DX-1512**



## EXCLUSIVE TICKET SALES SERVICES AGREEMENT

This Exclusive Ticket Sales Services Agreement (the "Agreement"), effective as of April __, 2021 (the "Effective Date"), is entered into by and between SeatGeek, Inc. ("SeatGeek") and Lincoln Holdings LLC d/b/a Monumental Sports and Entertainment ("MSE"); [Additional Parties] (together with MSE, the "MSE Parties"). This Agreement consists of this Exclusive Ticket Sales Services Agreement, Appendix A – Sponsorship Terms, Appendix B – Ticket Fees and Terms, Appendix C – Implementation and Training; Appendix D - Third Party Events; Appendix E – Incident Management; Appendix F – Marketing Services, and any other exhibits and appendices attached hereto, all of which are incorporated herein by this reference.

## R E C I T A L S

**WHEREAS**, SeatGeek offers on its own behalf and on behalf of third parties the SeatGeek Services, comprising a proprietary search, sales and distribution platform for Tickets to Events, in both the primary and secondary ticketing markets, including associated SaaS services and Software;

**WHEREAS**, the MSE and SeatGeek (each a "Party" and together, the "Parties") desire to enter into an agreement whereby the MSE Parties: (1) grant to SeatGeek certain Rights in connection with the Teams (as defined below) and the Venues (as defined below), including certain exclusive Rights in accordance with the terms and conditions of this Agreement; (2) engage SeatGeek as the exclusive ticketing service provider to the (i) Washington Wizards, a member franchise of the National Basketball Association ("NBA") that plays its home games at the Capital One Arena located at 601 F Street NW, Washington, D.C. 20004 ("Capital One Arena"); (ii) Washington Mystics, a member franchise of the Women's National Basketball Association ("WNBA") that plays its home games at the Entertainment and Sports Arena located at 1100 Oak St SE, Washington, D.C. 20032 ("E&S Arena"); (iii) Washington Capitals, a member franchise of the National Hockey League ("NHL") that plays its games at the Capital One Arena; (iv) Washington Go-Go, a member franchise of the NBA G-League ("G-League"); and (v) the venue known as EagleBank Arena located at 4500 Patriot Circle, Fairfax, VA 22030 ("EagleBank Arena") ( Washington Wizards, Washington Mystics, Washington Capitals and Washington Go-Go may be referred to herein individually as a "Team" and collectively as the "Teams"; Capital One Arena, E&S Sports Arena and EagleBank Area may be referred to herein individually as a "Venue" and collectively as the "Venues"); and (3) engage SeatGeek as a sponsor of the Teams and Venues pursuant to the sponsorship terms set forth as Appendix A; and

**WHEREAS**, the MSE Parties and SeatGeek desire to enter into this Agreement and the Sponsorship Agreement to mutually promote the success of the Teams, Venues and SeatGeek, such Agreement to supersede all other prior negotiations and understandings between the Parties whether oral or written, expressed or implied.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein and for good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## A G R E E M E N T

1.    **Definitions**. As used in this Agreement, the following terms shall have the respective meanings indicated below:

[PAGE]

**SeatGeek**

1.1.     "Additional Sports Team" means a professional, amateur/collegiate, developmental league, or electronic/video gaming sports team that plays game(s) at the Venues, *excluding* the Teams.

1.2.     "Commercial Category" means the advertising, promotion, offering, facilitation, sale or other distribution of tickets to events, including ticketing systems (primary and secondary) and applicable SeatGeek Services.

1.3.     "Contract Year" means each period from October 1 through the immediately subsequent September 30 except (i) Contract Year 1 shall commence on the Start Date.

1.4.     "Data Porting Rate" means $5,000 per additional year of data converted.

1.5.     "Existing Events" means Events for which Tickets have been sold as of the Effective Date by the then current ticketing service provider of the MSE Parties.

1.6.     "Event" means Team Events and all other publicly ticketed acts and events of any kind or nature whatsoever held at the Venues *except*: (i) Georgetown University athletics events held at Capital One Arena and (ii) George Mason University athletics events held at EagleBankArena.

1.7.     "Facility" means, the Venues, as applicable, and any parking lots owned, controlled, leased, licensed, or otherwise occupied or used by or on behalf of MSE Parties or the Teams and/or used for any Events.

1.8.     "Facility Box Office" means the Ticket sales location(s) located in, around or at the applicable Facility.

1.9.     "Governmental Act" means (i) the enactment, imposition, or modification of a law or regulation, which occurs after the Effective Date or (i) acts of a governmental authority (e.g., orders, regulations, condemnations, confiscations/seizures, etc.)

1.10.     "Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.11.     "Implementation Rate" means (a) with respect to onsite training in excess of the Setup Period, $1,200 per day and (b) with respect to remote training in excess of the Setup Period, $225 per hour.

1.12.     "Implementation Support Period" means the period of onsite support for the first three live Events, provided, such period shall not count against the Setup Period.

1.13.     "Law" means any and all applicable federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, ordinance, code, rule, regulation, ruling or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

1.14.     "League Rules" means all of the rules, regulations, and agreements of the NBA (including the NBA Constitution and By-Laws), WNBA, NHL, G-League and their respective

[PAGE]

 **SeatGeek**

*Confidential*

affiliated entities, as they presently exist or as they may, from time to time, be entered into, amended, or adopted.

1.15.     "Managed Services Assistance Rate" means $25,000 per year.

1.16.     "Marketing Services" means the services, to be provided by SeatGeek at no additional cost, as set forth in Appendix F.

1.17.     "Primary Ticket" means a primary (non-resale) Ticket to a particular Event.

1.18.     "Processing Fee" means a transactional processing fee of 2.65% of the total transaction value.

1.19.     "Rights" means all sponsorship rights and benefits granted to SeatGeek pursuant to this Agreement.

1.20.     "Sale," "Sell" and any derivations thereof in this Agreement shall include any distribution of Tickets (whether for consideration or for no consideration), by any means or method (including, without limitation, on the Internet or by auction), and shall include resales.

1.21.     "SeatGeek Competitor" means a company other than SeatGeek that is primarily engaged (i.e., operates a substantial part of its business) in the offering of primary and/or resale ticketing services for events (e.g., Vivid Seats, StubHub but not, for the avoidance of doubt, Amazon.com, Facebook.com, or Hotels.com).

1.22.     "SeatGeek Platform" means SeatGeek's proprietary search, sales and distribution platform for Tickets to Events, in both the primary and secondary ticketing markets, including associated SaaS services and Software, related procedures, and repair and maintenance services established and maintained by SeatGeek and its affiliates for the purpose of selling, distributing, auditing and/or controlling the Sale of Tickets for Events.

1.23.     "SeatGeek Services" means the SeatGeek Platform, verification and fulfillment services; integration, testing and training; hosting, maintenance and support; and evolution, including advancement of technology platforms powering both the primary and secondary digital ticketing applications; and application support for visitor and access control management.

1.24.     "Secondary Ticket" means a Ticket that is resold via the SeatGeek Platform following the initial Sale of such Ticket for any particular Event.

1.25.     "Setup Period" means 120 days of initial setup, provided to MSE Parties at no additional charge.

1.26.     "Software" means SeatGeek's Ticketing system software and any other deliverables furnished by SeatGeek and/or for SeatGeek Platform access (including, but not limited to, APIs and SDKs) provided to MSE Parties or any third party by SeatGeek during the Term.

1.27.     "Start Date" means the date ninety (90) days following the Effective Date.

1.28.     "Support Period" means the period of support following the Implementation Support Period and Setup Period, which shall consist of (a) twenty (20) days per Contract Year

[PAGE]



of onsite support at no additional cost to MSE Parties and $1,200 per day thereafter; (b) fifteen (15) hours per quarter of each Contract Year of training at no additional cost to MSE Parties and $225 per hour thereafter; and (c) twenty (20) hours per quarter of each Contract Year of Event setup and configuration at no additional cost to MSE Parties and $225 per hour thereafter.

1.29.     "Team Events" means (i) Team home games at the Venues; (ii) Washington Mystics away games ("Mystics Away Games"); *provided* MSE Parties shall be responsible for logistical support and operation of Mystics Away Games; (iii) Washington Go-Go away games ("Go-Go Away Games"); *provided*, MSE Parties shall be responsible for logistical support and operation of Go-Go Away Games; (iii) any home and away games played by an Additional Sports Team; and (iv) all other publicly ticketed events sanctioned, promoted, operated, or otherwise arranged by or on behalf of the Teams at a venue for which the MSE Parties control the ticketing services rights.

1.30.     "Third Party Integrations" means such third party integrations as mutually agreed by the Parties.

1.31.     "Ticket" means a printed, electronic or, to the extent then-supported by SeatGeek, other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Event, even if not evidenced by any physical manifestation of such right (e.g., an electronic image displayed on mobile device).

1.32.     "Ticket Receipts" means the amount of the Total Retail Price of a Ticket sold hereunder.

1.33.     "Total Retail Price" means the total price charged at checkout to include all fees, taxes, and shipping. For the avoidance of doubt, the "Total Retail Price" shall reflect the full amount that a consumer pays for a Ticket (i.e., the amount displayed on a consumer's credit card statement).

1.34.     "Turnaround Time" means (a) with respect to single Events, as set forth in Appendix D; and (b) with respect to any multiple-Event packages, two (2) business weeks.

1.35.     "Venue Capacity" means a percentage of the seating manifest of the applicable Venue for a particular Venue event that is available to the applicable MSE Party to publicly Sell Tickets to in compliance with the requirements of a Governmental Act.

2.     **Term.**

2.1.     The term ("Term") of this Agreement shall begin on the Start Date and end on September 30, 2031, unless sooner terminated in accordance with the terms of this Agreement. For the avoidance of doubt, this Agreement will be effective and binding as of the Effective Date, but the sale of Tickets commences as of the Start Date.

2.2.     Exclusive Negotiation Period.   During the period from September 30, 2030, through March 31, 2031 (the "Exclusive Negotiation Period"), the Parties shall exclusively discuss in good faith terms and conditions pursuant to which they would mutually agree on an extension of the Term of this Agreement.   Any such extension, if agreed upon by the Parties, shall be set forth in a writing executed by authorized representatives of each Party.   In the event that SeatGeek and MSE Parties have not agreed in writing to extend the Term of this Agreement by the expiration of the Exclusive Negotiation Period, then, commencing on April 1, 2031, the MSE

[PAGE]

CONFIDENTIAL
Confidential

MONUMENTAL-DCAG-0000221



Parties may, directly or indirectly, negotiate with any third party with regard to the Rights in SeatGeek's Commercial Category and SeatGeek Services under this Agreement. Prior to April 1, 2031, MSE Parties shall not, directly or indirectly, negotiate with any third party with regard to the exclusive rights in SeatGeek's Commercial Category or the SeatGeek Services under this Agreement.

3.      **Sponsorship Rights**.

3.1.      <u>Sponsorship Rights and Fees</u>.  SeatGeek shall receive the Rights set forth in <u>Exhibit A</u> in exchange for the sponsorship fees set forth therein in accordance with the terms thereto.

4.      **Exclusivity; Distribution Partners**.

4.1.      <u>Grant of Exclusive Rights</u>.  Except as specifically set forth herein, the MSE Parties hereby grant to SeatGeek, and SeatGeek accepts from the MSE Parties, the right during the Term of this Agreement to be the exclusive third party seller of all Primary Tickets to all Events which are open to the general public and scheduled to take place during the Term.  For the avoidance of doubt, the foregoing limitations on SeatGeek's exclusivity for Primary Ticket Sales shall not limit or restrict in any way SeatGeek's marketplace for Secondary Ticket Sales to any Event.

4.2.      <u>Promotional Messaging</u>.  With the exception of mutually agreed upon exceptions, in all "call to action" Ticket Sales messaging distributed via channels controlled by the MSE Parties (e.g. radio, TV, digital, charitable, in-Venue, social media, and out-of-home), SeatGeek will be listed and promoted as the MSE Parties' exclusive ticketing partner.

4.3.      <u>Existing Events</u>.  Notwithstanding anything to the contrary contained herein, the MSE Parties shall be permitted to continue working with their then current ticketing service provider ("<u>Existing Provider</u>") in connection with Existing Events.  If the Existing Provider is no longer providing services for the Existing Events for any reason, SeatGeek agrees to use its commercially reasonable efforts to take over the continued sale and fulfillment of the Existing Events.  SeatGeek will not be obligated to commence the provision of such services for the Existing Events on less than 45 days' prior written notice from the MSE Parties.

4.4.      <u>Distribution Partners</u>.  SeatGeek agrees to support open distribution of Tickets by the MSE Parties, including via the MSE Parties' own channels and any third party channels approved by SeatGeek, with such approval not to be unreasonably withheld (each such channel, a "<u>Distribution Partner</u>"); *provided, however*, that the Sale or other distribution of Tickets for Events by Distribution Partners shall be subject to (1) at SeatGeek's election, SeatGeek serving as the merchant of record or SeatGeek's receipt of the corresponding compensation set forth herein for such transactions; (2) the use by any such Distribution Partner of the SeatGeek Platform as provided for herein, including any bar code requirements instituted by SeatGeek; (3) the requirement that any such Distribution Partner must comply with generally applicable terms and conditions for the Sale of Tickets for Events with which the MSE Parties require SeatGeek to comply; and (4) the requirement that, except as otherwise set forth herein, the MSE Parties shall not cause or permit any Distribution Partner in SeatGeek's Commercial Category to use any designation to refer to a similar affiliation with the MSE Parties as between SeatGeek and the MSE Parties pursuant to this Agreement.  SeatGeek will authenticate Tickets (i.e., re-issue barcodes) on all Ticket Sales made by or on behalf of Distribution Partners.  In furtherance of this third party distribution, SeatGeek will (x)   broadcast relevant Teams Ticket inventory to Distribution Partners; (y) not impose any restriction on Distribution Partner transaction volume for

[PAGE]



Teams or other third party Events; and (z) will make available and require usage of barcode reissue API (e.g., in connection with resale or transfers) to Distribution Partners. SeatGeek shall allow the MSE Parties to enroll (at no additional charge) to SeatGeek Open, an open distribution platform that enables Tickets to be sold directly within mobile applications, websites and other platforms owned or controlled by SeatGeek's Distribution Partners; *provided, however,* SeatGeek shall not be responsible for providing the MSE Parties with any marketing assistance or marketing services with respect to the MSE Parties' use of SeatGeek Open.

4.5.    Approved Distribution Partners. For purposes of this Agreement, TicketNetwork, Gametime, TickPick, StubHub, Ingresso and Coras shall be deemed approved Distribution Partners of the MSE Parties by SeatGeek, *provided, however,* any such entities integrate with existing APIs (as defined below). The MSE Parties (or third party vendors) shall not incur any additional charge for integrating the SeatGeek Platform with (i) existing direct channels (e.g., [ HYPERLINK "https://www.nba.com/wizards/" \h ], Teams mobile applications) and third party vendors of the NBA, WNBA, NHL, G-League or the MSE Parties; or (ii) other APIs and integrations that SeatGeek provides to any other customers during the Term. SeatGeek will also provide the MSE Parties with SSO access in order to permit fans to use SeatGeek credentials (username and password) to log in to fan-facing applications. The foregoing commitment includes maintaining such integrations throughout the Term. If the MSE Parties request a custom integration outside of clauses (i) and (ii), then SeatGeek may charge the MSE Parties on a time and materials basis for such work using a rate card to be mutually agreed to by the Parties. The MSE Parties acknowledge and agree that SeatGeek will not be charged by any current or future integration partner for any costs or expenses incurred in connection with or related to such integrations.

4.5.1.    Inventory. SeatGeek acknowledges and agrees that, subject to League Rules, as applicable, and notwithstanding anything herein to the contrary, (i) the MSE Parties will determine how and where inventory is distributed; (ii) SeatGeek shall not impose any restrictions on approved Distribution Partner transaction volume for any Events; (iii) SeatGeek will provide listings and barcode reissue API (e.g., resale, transfers) to sanctioned Distribution Partners; and (iv) the MSE Parties may pursue commercial agreements with approved Distribution Partners.

4.5.2.    API Requirements. SeatGeek shall make available its then-standard application programming interface, SDK or other digital interfaces (collectively, "APIs") to enable Distribution Partners' and Additional API Licensees' (as defined below) permitted use of the SeatGeek Platform hereunder. MSE Parties shall cause each such Distribution Partner and Additional API Licensee, on a royalty-free basis: (a) to use such APIs (and not any other mechanism) to connect to the SeatGeek Platform; (b) to grant to SeatGeek the necessary rights and to provide to SeatGeek the assistance reasonably necessary in order to operate and maintain such APIs; and (c) to use such API access, including, without limitation, any and all reporting or other data or materials resulting therefrom, solely for the benefit of the MSE Parties' internal business operations and for no other purpose whatsoever. SeatGeek shall grant to such Distribution Partners and Additional API Licensees the right to use such APIs on a royalty-free basis; *provided, however,* that such Distribution Partners and Additional API Licensees shall be required to (x) to execute and comply with SeatGeek's then-current form API license agreement in connection with such use and (y) to maintain, at each such Distribution Partner's and Additional API Licensee's sole expense, whatever insurance coverage, hardware, software, systems, connectivity, networks and other information technology assets that may be required in order to use such API. The requirements set forth in clauses (a), (b), (c), (x) and (y) of this Section 4.5 shall be referred to herein as the "API Requirements."

[PAGE]



4.6.     <u>Access to On-Sale and Pre-Sale Tickets</u>.  Notwithstanding anything herein to the contrary, MSE Parties will cause SeatGeek to have the exclusive right (i.e., exclusive as to third parties, as well as to MSE Parties) to Sell Tickets from the Venue Capacity to any particular Event or series of Events at least seventy-two (72) hours prior to the time (e.g., the pre-Sale date or on-Sale) that any Distribution Partner has the right to Sell Tickets to any such Event or Events.

4.7.     <u>Third Party Events</u>. SeatGeek shall provide support for third party Events as set forth in <u>Appendix D</u>.

5.     **Marketing and Analytics Support**.  As between the Parties, MSE Parties shall have sole responsibility for outbound marketing and promotion of Sales of Tickets for Events, including, without limitation, employing and/or retaining all Ticket Sales representatives and personnel (for the avoidance of doubt, such individuals shall use the SeatGeek Platform in order to effect such Sales as set forth herein).  Notwithstanding the foregoing, SeatGeek shall facilitate such efforts at its sole discretion, at no additional cost to MSE Parties, to effect the Marketing Services, the non-public and any proprietary aspects of which shall be considered SeatGeek Confidential Information and may not be used by MSE Parties for any purpose other than for advertising and promoting the Sale of Tickets to Events hereunder.

6.     **Compensation**.

6.1.     <u>SeatGeek Charges and Fees</u>.  SeatGeek shall be entitled to assess and receive charges and fees in the amounts set forth in <u>Appendix B</u>.  The Parties shall settle amounts (i.e., remit amounts due to the other) within 30 days from the end of the last day of each month (or more frequently as agreed upon by the Parties).  SeatGeek shall remit fees in accordance with the terms herein, and MSE Parties shall remit fees to SeatGeek by ACH or wire transfer (at SeatGeek's discretion and direction). In the event applicable law prohibits the assessment of any such fees, SeatGeek and MSE Parties shall agree on alternative means for compensating SeatGeek for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law.

6.2.     <u>Promoter Fees</u>. Promoters for third party Events at the Venue shall have the ability to "turn off" the re-Sale of Tickets at their sole discretion.  For any secondary Sale of Tickets, SeatGeek shall set the Secondary Ticket fee revenue at its sole discretion and shall remit to MSE Parties any applicable amounts due to the MSE Parties as set forth in this Agreement. In the event that SeatGeek is required to refund any Secondary Ticket fee revenue, MSE Parties agree to refund to SeatGeek within three (3) business days all such applicable amounts following SeatGeek providing reasonable documentation of the basis for such refund.

6.3.     <u>Financial Information</u>.  MSE Parties acknowledge and agree that the respective charges and fees to be retained by each of the MSE Parties and SeatGeek hereunder are based, in part, on information provided by the MSE Parties to SeatGeek as of or prior to the Effective Date regarding historical and projected Events, including, without limitation, historical and projected ticket prices and ticket sales for such Events ("<u>Event Statements</u>").  MSE Parties represent, warrant and covenant that all such Event Statements (a) with respect to Events occurring prior to the Effective Date, are true, correct and complete and (b) with respect to Events projected to occur following the Effective Date ("<u>Future Event(s)</u>"), represent MSE Parties' best, reasonable and good faith projections.  In the event of the occurrence (or non-occurrence) of any fact or circumstance that leads MSE Parties reasonably to determine that the Event Statements overstate the actual number of Future Events that MSE Parties reasonably expect to occur during the Term (or the projected ticket prices or ticket sales therefor) (x) MSE Parties shall notify

[PAGE]

MONUMENTAL-DCAG-0000224

**DX-1512.0008**

 SeatGeek

*Confidential*

SeatGeek of such determination and (y) the parties shall discuss in good faith an appropriate remedy therefor, which remedy may include a mutually agreed upon written modification to the economic terms set forth herein.

7.    **Product Credit and Connectivity**.

7.1.    <u>Product Credit</u>.  During the Term, SeatGeek will provide the MSE Parties with a credit (the "<u>Product Credit</u>") that covers the costs related to the set-up and licensing for the MSE Parties' preferred third-party access control partners, Fortress or Axess, such costs not to exceed (i) $150,000 with respect to Contract Year 1 and (ii) $75,000 with respect to each of Contract Years 2-10. Any leftover credit for the applicable Contract Year may be used by the MSE Parties towards documented ticketing-related vendor expenses, including but not limited to 3D mapping, virtual relocation, group sales tools and CRM tools and software.

7.2.    <u>Connectivity</u>.  The MSE Parties will provide the necessary power, connectivity, storage, and security to operate the Hardware at no additional cost to SeatGeek.  SeatGeek shall ensure, at no additional cost, that upon commercially reasonable notice, the SeatGeek Platform supports industry standard ticketing and visitor access management technologies adopted by the MSE Parties.  The MSE Parties agree to work with either Fortress or Axess for deployment of ticketing and access control technology.  Notwithstanding the foregoing, the MSE Parties will have the right to change (at its own cost) its access control technology provider during the Term.

7.3.    <u>Permission</u>.    SeatGeek hereby grants MSE Parties non-exclusive, non-transferable permission to access the SeatGeek Platform as a SaaS service.  The SeatGeek Platform and all related materials may only be used by MSE Parties in connection with the Events, only with systems used, operated and owned by SeatGeek, only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied, or used by or on behalf or for the benefit of any third party.  MSE Parties shall use its access to the SeatGeek Platform in compliance with all federal, state, county, municipal and other laws, ordinances and regulations relating to the use of the access to the SeatGeek Platform.  MSE Parties hereby agree: (a) not to cause or permit copying, reproduction or third party use of the SeatGeek Platform in any manner, including, without limitation, use in a sharing or service bureau arrangement; (b) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the SeatGeek Platform (or any portion thereof) in any way nor merge the SeatGeek Platform into any other program for any purpose; (c) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise provide access (including sharing login credentials) to or make available the SeatGeek Platform (or any portion thereof), or any rights therein or copies or derivatives thereof; (d) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the SeatGeek Platform (or any portion thereof), or any copies, modifications or partial copies thereof; (e) not to "hack," or attempt to "hack," any of the SeatGeek Platform, the servers on which the SeatGeek Platform is hosted or any other portion of the SeatGeek Platform, or otherwise attempt to circumvent, or navigate outside of, the borders of such SeatGeek Platform servers, or any security measure of the SeatGeek Platform, in any manner whatsoever; and (f) not to distribute viruses or other malware through the SeatGeek Platform. SeatGeek shall be permitted to immediately terminate this Agreement or suspend MSE Parties' access to the SeatGeek Platform in the event of a breach by MSE Parties of this Section 7.

7.4.    <u>Credentials</u>.  Use of the SeatGeek Platform by MSE Parties shall be restricted to a reasonable number of MSE Parties' employees and independent contractors having user

[PAGE]



credentials in the event that SeatGeek assigns such credentials (and MSE Parties agree to be responsible for the acts and omissions of such employees and contractors in connection with the use or misuse of such credentials). Such credentials shall not be transferable without the written permission of SeatGeek, and such credentials shall immediately terminate in the event that any employee or independent contractor of MSE Parties ceases to retain such status. Upon SeatGeek's reasonable request, MSE Parties (a) shall identify, as the case may be, the users (by name, position and email address), who use or view the SeatGeek Platform and the locations from which the SeatGeek Platform is used, and (b) shall provide to SeatGeek access to any database which records access to the SeatGeek Platform. MSE Parties shall be responsible for all activity occurring via its credentials.

7.5.     Access to SeatGeek Platform. Subject in each instance to (a) the prior written consent (email to suffice) of SeatGeek and (b) each such third party's agreement to comply, and actual compliance, with the API Requirements, MSE Parties may permit its third-party vendors and service providers (e.g., consultants, etc.) ("Additional API Licensee(s)") to access the SeatGeek Platform via the API; *provided*, *however*, that (x) MSE Parties shall be legally and financially responsible for any damages incurred by SeatGeek in connection with any such access by any such Additional API Licensee and (y) any Additional API Licensee shall only use such access in connection with its performance of services solely for the benefit of MSE Parties and not for any other purpose.

8.     **Integration, Installation and Setup**.

8.1.     Setup. MSE Parties shall have sole responsibility for using the SeatGeek Platform in accordance with the terms of this Agreement. SeatGeek shall provide commercially reasonable remote and, as available, onsite implementation, as set forth in Appendix C, at no charge during the Setup Period, including (i) data conversion of the current season data; (ii) historical customer and purchase information beginning beginning with the 2019-2020 NBA season (consisting of customer's name and contact information); (iii) initial event and manifest builds; and (iv) system configuration and setup of reporting (together, the "Implementation Services"). For additional fees and at the election of the MSE Parties, SeatGeek shall (a) port over additional data per the Data Porting Rate and (b) provide multiple season mapping and payment plan mapping services at a rate to be negotiated in good faith between the Parties. SeatGeek shall designate a representative within its managed services team to serve as the MSE Parties' point of contact for software configuration and key launches. For the duration of the Term, SeatGeek will waive the Managed Services Assistance Rate and provide the MSE Parties with access to a managed services representative at no additional cost.

8.2.     Time to Live. In the event that MSE Parties contract for system and event configuration, SeatGeek shall build and put Events on Sale within the Turnaround Time.

8.3.     Project Management and Change Orders. SeatGeek shall designate a project manager ("Project Manager") who shall serve as MSE Parties' principal point of contact and shall be responsible for coordinating resources, supervising SeatGeek personnel, providing services and managing the transition to the SeatGeek Platform. MSE Parties may request SeatGeek to perform additional services including but not limited to additional training or support, integration, enhancements, development, project management and consultancy, following which request the Project Manager shall provide MSE Parties with a change order detailing any applicable changes in scope, resources required, work plan, due dates, additional estimated time and fees ("Change Order"). The Parties must properly execute the Change Order prior to the commencement of the

[PAGE]

**SeatGeek**

*Confidential*

services and resources specified therein. Change Orders are subject to the terms of this Agreement.

8.4. <u>Training</u>. SeatGeek shall provide commercially reasonable remote and, as available, onsite training for selected MSE Parties staff and ongoing support for MSE Parties, which will include onsite implementation support for the Implementation Support Period. SeatGeek shall also provide training to MSE Parties personnel to the extent such training is necessary as a consequence of changes initiated by SeatGeek or changes in SeatGeek's method of operation. To the extent of any change in sales personnel by the MSE Parties, the MSE Parties agree to pay SeatGeek for any training fees and pre-approved, reasonable, and documented related expenses, including travel expenses. MSE Parties acknowledge and agree that any person hours of professional services requested by MSE Parties over and above the commitments described in this Agreement, if actually provided by SeatGeek, shall be provided per the Implementation Rate. SeatGeek shall invoice MSE Parties for any such hours of services provided and MSE Parties shall pay such amounts within thirty (30) days of the date of invoice.

8.5. <u>SeatGeek Platform Configuration</u>. SeatGeek shall provide commercially reasonable professional integration services in order to enable the SeatGeek Platform to interoperate with MSE Parties' pre-existing hardware, software, networks, platform and vendors. For the avoidance of doubt, MSE Parties acknowledge and agree that the SeatGeek Platform shall not be operable in a production environment as of the Effective Date, and that the timing and setup thereof may be affected or delayed by incorrect or incomplete information and/or lack of access to appropriate personnel from MSE Parties. MSE Parties will provide (a) connectivity and interfacing that satisfy SeatGeek's minimum system requirements and (b) unless otherwise agreed upon between the parties, any type of equipment and technology necessary to assist SeatGeek in completing the installation of the SeatGeek Platform for MSE Parties. SeatGeek shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the Hardware and/or access to the SeatGeek Platform.

8.6. <u>Facility Box Office Will-Call Services</u>. At all times during the Term, MSE Parties shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Internet Sales and telephone Sales. The pick-up location shall be open during the normal hours of operation of the applicable Facility Box Office. The MSE Parties shall notify SeatGeek of MSE Parties' will-call capabilities and will-call Facility Box Office hours. MSE Parties shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card used in the Ticket Sales transaction. MSE Parties shall not release Tickets to any customer whose identity has not been so verified. For the avoidance of doubt, SeatGeek shall be responsible for supporting mobile delivery of Tickets and MSE Parties shall be responsible for supporting any telephone orders for Tickets.

8.7. <u>Ticket and Seat Locator Stock</u>. MSE Parties are responsible for supplying all ticket and seat locator stock. MSE Parties shall be responsible for the security of Ticket stock in its possession.

8.8. <u>Technical Support</u>. Technical support services will be provided, on a return call basis, during SeatGeek's normal business hours by personnel qualified to answer telephone inquiries by MSE Parties. Non-emergency calls or emails made at the end of the day, which require support services that would keep personnel beyond normal working hours, will be deferred to the following business day. Support will be provided for off-hour critical system emergencies, *provided, however*, MSE Parties acknowledge and agree that the support provided by SeatGeek

[PAGE]



*Confidential*

hereunder is not intended to serve as a managed service or to otherwise outsource any responsibilities or obligations of MSE Parties.

8.9. <u>Technical Contacts</u>. MSE Parties shall provide SeatGeek with remote access to MSE Parties' systems and facilities via a method to be determined by SeatGeek. MSE Parties shall appoint two (2) individuals who are knowledgeable in the operation of the SeatGeek Platform to serve as primary contacts with SeatGeek for the purposes of obtaining technical support ("<u>Technical Contacts</u>"). MSE Parties may change its Technical Contacts at any time upon written notification to SeatGeek (email to suffice). MSE Parties may initiate requests for support only through its Technical Contacts. MSE Parties may from time to time be required to provide SeatGeek with additional resources in order to obtain technical support, any such additional resources to be mutually agreed upon by the parties in good faith.

8.10. <u>Maintenance</u>. SeatGeek shall provide to the MSE Parties (a) any error correction, workaround, bug fix, patch, maintenance release or modification of a minor nature for the then-current version of the Software (an "<u>Update</u>") and (b) any new release of the Software containing significant enhancements to the previous version, and that is defined and publicly marketed and promoted by SeatGeek in the marketplace as a new version of the Software (a "<u>New Version</u>") when such Update or New Version are generally provided to other SeatGeek clients in the territory where the Venue is located. In order to maintain business operations, SeatGeek shall have the right to require MSE Parties to download an Update or upgrade to a New Version. SeatGeek's Managed Services and Support team ("<u>Managed Services and Support Team</u>") and MSE Parties shall use commercially reasonable efforts to ensure that MSE Parties do not remain more than two (2) versions behind the then-current version of the Software.

8.11. <u>Incident Management</u>. SeatGeek shall provide incident management services in accordance with the terms set forth on <u>Appendix E</u>.

8.12. <u>Customer Support</u>. SeatGeek shall provide a dedicated phone number and email address for MSE Parties and its end-users experiencing ticket management questions, issues or concerns ("<u>Customer Experience</u>"). Customer Experience shall be available every day, including holidays, at the then-current customer support hours. SeatGeek shall use reasonable commercial efforts to ensure that (a) eighty percent (80%) of Customer Experience phone calls are answered in less than one (1) minute and (b) eighty percent (80%) of Customer Experience emails are replied to in less than four (4) hours, provided that acknowledgment of receipt of an email shall be deemed a valid response, provided further, such service levels shall be subject to change based on available resources.

8.13. <u>Access to MSE Parties' Equipment and Data</u>. MSE Parties shall permit SeatGeek, once per Contract Year or upon reasonable belief by SeatGeek of non-compliance with the terms of MSE Parties' permitted use of the SeatGeek Platform hereunder (in each case, particular timing to be mutually agreed to by the Parties), the right to inspect MSE Parties' pertinent sites and equipment (e.g. premises where equipment is located; Hardware, software and related systems are stored and used; systems on which SeatGeek Platform is accessed for the purpose of conducting transactions contemplated herein) for the purpose of determining compliance with the terms of MSE Parties' permitted use of the SeatGeek Platform hereunder. MSE Parties will provide SeatGeek at all times with remote access to the Hardware and MSE Parties' related hardware, software, systems, infrastructure and Customer Data (as defined in Section 11.2.1) for the purpose of SeatGeek's performance pursuant to and in accordance with this Agreement.

[PAGE]



*Confidential*

8.14.    <u>Third Party Integrations</u>.  SeatGeek shall provide MSE Parties with Third Party Integrations and the applicable pricing, delivery schedules and support and maintenance terms.

8.15.    <u>Request for Information</u>.  MSE Parties may request commercially reasonable details tied to hosting and management of the SaaS platform (e.g. end-point audit logs, up-time verification, etc.) and receive back requested detail within three (3) business days (except in the case of an emergency).

9.    **Accounting Procedures**.

9.1.    <u>Procedure for Payments by SeatGeek</u>.  MSE Parties will authorize SeatGeek and SeatGeek's financial institution ("<u>Bank</u>") to deposit all settlement funds payable to MSE Parties hereunder to the account designated by MSE Parties ("<u>Account</u>").  SeatGeek will settle funds to the MSE Parties weekly, provided, such weekly settlement shall be one aggregate amount and MSE Parties shall be responsible for any reconciliation.  SeatGeek shall remit fees in accordance with the terms herein, and MSE Parties shall remit fees to SeatGeek by ACH or wire transfer (at SeatGeek's discretion and direction).  SeatGeek will collect all Ticket Receipts and shall initiate payment of that portion of Ticket Receipts to which MSE Parties are entitled hereunder.  Initiation of the settlement payment via direct deposit shall constitute full performance by SeatGeek of its obligation to make such settlement payment to MSE Parties or to any person whatsoever.  If funds to which MSE Parties are not entitled are deposited into MSE Parties' Account, MSE Parties shall promptly authorize SeatGeek to direct the Bank to return said funds (subject to SeatGeek providing reasonable evidence to MSE Parties of such error).  MSE Parties hereby release SeatGeek from liability for delays or errors beyond SeatGeek's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated account information provided by MSE Parties or Bank processing delays, or for any related damages.  MSE Parties acknowledge and agree that direct deposit of such funds may require up to three (3) business days for Bank processing.  In the event of an error, MSE Parties shall promptly authorize the initiation of a debit to MSE Parties' account to correct the error (subject to SeatGeek providing reasonable evidence to MSE Parties of such error).  The direct deposit authorization provided herein shall remain in full force and effect until SeatGeek has received written notification from MSE Parties of its termination in such time and such manner as to afford SeatGeek a reasonable opportunity to act upon it.

9.2.    <u>Cancelled Events; Refunds</u>.  With respect to Primary Tickets to cancelled Events, SeatGeek shall hold an Account Balance for any Event that is cancelled, postponed, or modified (e.g., substitute acts) for any reason (each, a "<u>Cancelled Event</u>"), and make such Account Balance available for distribution to ticket purchasers entitled to refunds for tickets for Cancelled Events purchased from SeatGeek.  The term "<u>Account Balance</u>" shall mean the amount of funds held at any time by SeatGeek on account of Ticket Sales for all Events, less the amount of Ticket Fee proceeds that SeatGeek retained hereunder.  In the event that the Account Balance is diminished such that SeatGeek reasonably determines that it is insufficient to refund Ticket purchases for Events, SeatGeek shall notify the MSE Parties of such determination and, as soon as practicable thereafter, the MSE Parties shall provide SeatGeek with a reasonable amount from funds received by the MSE Parties, sufficient to effect such refunds, to hold as the Account Balance.  Within a reasonable amount of time following the Term, SeatGeek shall pay the then-current Account Balance to the MSE Parties.  The MSE Parties authorize SeatGeek to refund the ticket price at the original point of purchase in such manner (e.g., by crediting the consumer's credit card) and at such time (e.g., before or after the scheduled date of the performance of such Event) as SeatGeek and the MSE Parties determine and to exchange tickets pursuant to any exchange policy that may be adopted by the MSE Parties and SeatGeek.  It is agreed and

[PAGE]



understood that SeatGeek's agreement to make any refunds is subject and limited to SeatGeek holding or receiving from the MSE Parties the full amount of funds (less SeatGeek's fees which are the responsibility of SeatGeek to refund to the consumer) necessary to make refunds to all ticket purchasers properly entitled to a refund, which funds shall be provided to SeatGeek within three (3) business days of the MSE Parties canceling any Events. SeatGeek shall be required to refund to a consumer the SeatGeek fees assessable with respect to the Sale of such Tickets to Cancelled Events and any other fees assessable and no additional compensation shall be payable to, or fees assessed by, SeatGeek with respect to the exchange of any such tickets. The MSE Parties shall be responsible for all refunds and exchanges of tickets purchased from the Venue Box Office.

9.3.    Credit Card Processing.

9.3.1.    Merchant of Record. Sales of Tickets on SeatGeek's primary ticketing platform, in each case via the internet, app, phones and any other properties owned and/or operated by SeatGeek through the SeatGeek Platform shall be processed by SeatGeek, as merchant of record, pursuant to its agreement with a credit card processor (the "SeatGeek Processor Agreement"). SeatGeek shall be identified as the merchant of record conducting the payment transaction with the purchaser of such Tickets. SeatGeek or the credit card processor shall provide MSE Parties with access to transaction reports regarding authorized and settled transactions. MSE Parties agree that, for operational and monitoring purposes, the credit card processor may provide SeatGeek with processing and settlement reports related to sales using the SeatGeek Platform. Notwithstanding the terms in any SeatGeek Processor Agreement, SeatGeek shall, at all times during the Term, charge MSE Parties the Processing Fee, which may be increased from time to time in the event SeatGeek's credit card processing fees are increased, on all credit card transactions for sales on SeatGeek's primary ticketing platform via the internet, app, phones and any other properties owned and/or operated by SeatGeek through the SeatGeek Platform. MSE Parties may elect, at any time and from to time, to utilize SeatGeek's credit card processor in accordance with the terms of this Section for all credit card transactions for sales of Tickets through the Facility Box Office, in which event SeatGeek shall charge MSE Parties the Processing Fee on all such credit card transactions. In connection with MSE Parties electing to utilize SeatGeek's credit card processor for sales of Tickets through the Facility Box Office, MSE Parties shall enter into any reasonable and necessary agreement with SeatGeek's credit card processor ("MSE Parties Processor Agreement"). The MSE Parties Processor Agreement shall provide that, if the related SeatGeek Processor Agreement expires or terminates, then the MSE Parties Processor Agreement shall also expire or terminate without any early termination penalties or charges. In order to facilitate streamlined credit card authorization processing for SeatGeek and its clients, SeatGeek may maintain relationships with other processors throughout the Term of this Agreement. In the event that SeatGeek elects to use a different credit card processor, MSE Parties may enter into an agreement with such new processor (in accordance with this Section). Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that each Distribution Partner may serve as the merchant of record for Sales of Tickets on its platforms. If MSE Parties decide, at any time and from time to time, to utilize its own credit card processor(s) for sales through the Facility Box Office, SeatGeek will use commercially reasonable efforts to integrate, implement and test the new processor within six (6) months of the notice of such change. Notwithstanding anything herein to the contrary, any subsequent changes to the payment processor at the election of the MSE Parties that require SeatGeek's support services shall be provided at a mutually agreed upon hourly service charge.

9.3.2.    Card Acceptance. SeatGeek agrees to accept Visa, Mastercard, American Express, and Discover (each, a "Card Network") credit cards (each, a "Card") in connection with

[PAGE]



*Confidential*

the Sale of Tickets using SeatGeek's credit card processor. MSE Parties agree to assist SeatGeek in accepting these Cards, including by agreeing to swipe, or "dip" in the case of chip Cards, all Cards presented for in-person transactions at the Facility Box Office. In addition, MSE Parties shall obtain the customer's billing address for address verification for all online or telephone transactions handled by MSE Parties. SeatGeek shall transmit data relating to all Sales using SeatGeek's credit card processor to such credit card processor, provided that SeatGeek has received all information deemed necessary and requested by SeatGeek to facilitate the transmission of such sales data. MSE Parties shall submit only valid transactions for the sale of Tickets. MSE Parties shall display Card Network logos at all points of physical Card acceptance and shall clearly display the refund policies (including those related to Cancelled Events) in accordance with the rules and regulations of each Card Network, as applicable (the "Operating Regulations"). MSE Parties shall appropriately train its staff in those operating procedures required by this Agreement with respect to sales transactions conducted by its staff using the SeatGeek Platform in order to reasonably mitigate against fraudulent transactions. MSE Parties are responsible for any unintended use of cardholder data by its staff. MSE Parties shall not use or disclose to any person or entity any Card or cardholder data for any purpose other than as contemplated by this Agreement. In connection with Sales and transactions conducted by MSE Parties using the SeatGeek Platform, MSE Parties shall comply with any applicable Operating Regulations, the Payment Card Industry Data Security Standard (PCI DSS), and applicable laws associated with the processing of card transactions.

9.4.     <u>Processor Integration</u>. SeatGeek may provide Implementation Services relating to the integration of SeatGeek's card processor systems in accordance with the terms herein ("<u>Processor Integration</u>"). Processor Integration will be provided remotely by SeatGeek at no additional cost to MSE Parties. In connection with the Processor Integration, SeatGeek shall provide MSE Parties with (a) payment terminals and other necessary hardware at no additional cost and (b) weekly settlements reporting and ad-hoc payment processing support with respect to issues attributed to the SeatGeek Platform or the integration thereof with SeatGeek's credit card processor. For the avoidance of doubt, the services contemplated in this Section 9.4 shall be provided only to the extent that MSE Parties utilize (i) SeatGeek's then-current credit card processor (currently Adyen); or (ii) such other credit card processor as approved by SeatGeek in its sole discretion.

9.5.     <u>Chargebacks</u>. MSE Parties shall be responsible for, and SeatGeek reserves the right to deduct from MSE Parties' settlement portions, any credit card processing fees and related costs, and Chargebacks that SeatGeek is assessed by its merchant bank and/or processor for up to twelve (12) months after the occurrence of an Event. For purposes of this Agreement, "<u>Chargebacks</u>" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Events, etc.).

9.6.     <u>Insolvency; Deficiency Amounts; Security for Repayment</u>. MSE Parties shall provide immediate written notice to SeatGeek in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of MSE Parties' business or the assignment of all or substantially all of the assets of MSE Parties for the benefit of creditors (each, a "<u>Material Financial Event</u>"). The Parties agree that this Agreement constitutes a financial accommodation by SeatGeek to MSE Parties as such term is utilized in 11 U.S.C. § 365. If at any time the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, MSE Parties shall deliver the amount of such deficiency ("<u>Deficiency Amount</u>") to SeatGeek no later than twenty-four (24) hours after written notice thereof (email to suffice) by SeatGeek to MSE Parties. SeatGeek shall have the right to setoff any

[PAGE]



Deficiency Amount against any amounts held by SeatGeek on behalf of MSE Parties. In the event of any Material Financial Event or in the event the MSE Parties have not paid any Deficiency Amount when due, SeatGeek shall have the option to require MSE Parties to provide additional security to SeatGeek of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by SeatGeek to cover such deficiency, which the MSE Parties shall provide to SeatGeek within five (5) business days after SeatGeek's request.

    9.7.    <u>Counterfeit Tickets</u>.  It is agreed and understood that SeatGeek shall not be liable to MSE Parties for the printing and sale of counterfeit tickets to Events.

    9.8.    <u>Audit of Sales</u>.  At all times during the Term of this Agreement, (a) MSE Parties shall have the right at the MSE Parties' own expense, up to two (2) times per year, to request log files to confirm Sales of Tickets hereunder, and (b) SeatGeek shall have the right at its own expense to audit Ticket Sales for Events made by MSE Parties and by others (including, without limitation, the promoter and sponsor of any Event, the act or Event itself) to evaluate compliance with the terms of this Agreement.

    9.9.    <u>Request for Taxpayer Identification Number and Certification</u>.  MSE Parties shall complete a Form W-9 and return it to SeatGeek with this Agreement for purposes of reporting to the Internal Revenue Service.

    10.    **<u>Taxes</u>**.

    10.1.    <u>Event Taxes</u>.  MSE Parties shall be responsible for calculating any and all taxes relating to MSE Parties and/or the Events and taxes due in connection with the Sale of Primary Tickets to the Events, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such taxes, and for timely remitting such taxes to the appropriate taxing authority.  In the event that SeatGeek pays any such taxes on behalf of MSE Parties or SeatGeek pays any such taxes due to a failure by MSE Parties to provide SeatGeek with the required writing or documentation of any MSE Parties tax exemptions, MSE Parties shall promptly reimburse SeatGeek for any and all such taxes paid by SeatGeek, including penalties and interest assessed with respect thereto (other than any such taxes, penalties and interest that SeatGeek pays directly out of MSE Parties' Ticket Receipts), and shall also promptly reimburse SeatGeek for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by the MSE Parties to properly calculate and timely remit taxes assessed on all amounts received by MSE Parties under this Agreement, to timely file all related returns or reports, or to timely reimburse SeatGeek for any and all such taxes, interest and penalties as provided above.  Notwithstanding the foregoing, in the event that SeatGeek is ever required by applicable law to remit taxes directly on behalf of MSE Parties and file related tax returns or reports, SeatGeek shall have the right to do so upon notice to MSE Parties, and thereafter "Ticket Receipts" shall be defined to be reduced by such taxes.  SeatGeek shall be responsible for calculating any and all SeatGeek taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such SeatGeek taxes, and for timely remitting such SeatGeek taxes to the appropriate taxing authority.

    10.2.    <u>Additional Taxes</u>.  Any amounts due to or to be retained by SeatGeek are exclusive of all applicable sales, use, value-added and other taxes, and all applicable duties, tariffs, assessments, export and import fees, or other similar charges, and MSE Parties will be responsible for payment of all such taxes (other than taxes based on SeatGeek's revenue or income), fees, duties, and charges and any related penalties and interest, arising from amounts due to or to be retained by SeatGeek.  MSE Parties will make all payments to SeatGeek free and

[PAGE]



*Confidential*

clear of, and without reduction for, any withholding taxes; any such taxes imposed on payments to SeatGeek will be MSE Parties' sole responsibility, and MSE Parties will provide SeatGeek with official receipts issued by the appropriate taxing authority, or such other evidence as SeatGeek may reasonably request, to establish that such taxes have been paid.

10.3.    <u>MSE Parties' Tax Exemptions</u>.  The MSE Parties shall notify SeatGeek in writing of any and all MSE Parties tax exemptions (if applicable) and provide SeatGeek with reasonable proof of MSE Parties' tax exemptions.

11.    <u>Title</u>.

11.1.    <u>Software</u>.  MSE Parties covenant and agree that the Software, APIs, SDKs and any deliverables or work product furnished under this Agreement are, and shall at all times be and remain, the sole and exclusive property of SeatGeek (or its licensors), and MSE Parties shall have no right, title or interest therein or thereto except as a permitted user thereof. MSE Parties acknowledge and agree that SeatGeek has invention rights, copyrights, and other intellectual property rights in the SeatGeek Platform and the information contained therein which prohibit copying, sale, modification and re-manufacture of the SeatGeek Platform and information regarding the SeatGeek Platform and which will be enforced.  MSE Parties hereby agree that MSE Parties will, whenever reasonably requested by SeatGeek, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form satisfactory to SeatGeek, to protect the rights and ownership of SeatGeek to and of the SeatGeek Platform.  Upon the expiration or termination of this Agreement, any and all access and other rights to the SeatGeek Platform shall terminate with respect to the MSE Parties.  The MSE Parties hereby grant to SeatGeek a non-exclusive, royalty-free, worldwide, transferable, sublicensable, irrevocable, perpetual license to use or incorporate into the SeatGeek Platform any suggestions, enhancement requests, recommendations or other feedback provided by MSE Parties relating to the SeatGeek Platform or Software.

11.2.    <u>Customer Data</u>.  In connection with the implementation of the SeatGeek Platform hereunder, the MSE Parties shall provide SeatGeek with certain existing ticket holder data actually in their possession (which, unless restricted, shall include name and email address, in a mutually agreed upon form, format, and transmission method).   SeatGeek will convert the following MSE Parties' data into the SeatGeek Platform: (a) customer records (name, contact information); and (b) transactional records as of a date to be mutually agreed upon by the Parties (such ticket holder data, information, transactions and records existing prior to the Term shall collectively be referred to as the "<u>Existing Ticketholder Data</u>").   The MSE Parties will use commercially reasonable efforts to make available prior customer transaction history through the MSE Parties' data warehouse.  The Parties shall mutually agree which individuals within the Existing Ticketholder Data shall be targeted by SeatGeek for account activations (the "<u>Target Customers</u>").  SeatGeek shall import the Existing Ticketholder Data of such Target Customers so that such Target Customers can create a pre-populated account within the SeatGeek Platform by activating via an email link (which email will be sent by SeatGeek unless the MSE Parties elect to send such email; and in all events the content of such email will be subject to MSE Parties' review and approval).  For those Target Customers who activate via an email link and thereby create an account within the SeatGeek Platform (each, a "<u>Converted Target Customer</u>"), the Existing Ticketholder Data used for the pre-populated account shall be deemed Customer Data (defined below) following activation.  All other Existing Ticket Holder Data (other than the Existing Ticket Holder Data of the Converted Customer Targets) shall be owned by the MSE Parties and not used by SeatGeek without the MSE Parties' prior written consent in each instance.

[PAGE]



11.2.1.    Data Compliance.  The MSE Parties and SeatGeek shall each own rights, without any duty of accounting, to the personal data with respect to persons who actually purchase, access or transfer tickets to Events through the SeatGeek Platform during the Term ("Customer Data").  Each Party agrees to use, collect, store, distribute, and combine the Customer Data only in compliance with all applicable laws, statutes, regulations and administrative rulings, generally accepted industry standards, and self-regulatory guidelines, and in accordance with such Party's own posted privacy policies, which shall be commercially reasonable and comply with applicable laws, statutes, regulations and administrative rulings.  Each Party agrees that it shall maintain throughout the Term reasonable security procedures and practices appropriate to the nature of the Customer Data to protect the Customer Data from unauthorized access, destruction, use, modification, or disclosure.

12.    **Confidential Information**.

12.1.    Defined.  As used herein, the "Confidential Information" of a Party will mean any and all technical and non-technical information disclosed by such Party (the "Disclosing Party") to the other Party (the "Receiving Party"), which may include without limitation: (a) patent and patent applications; (b) trade secrets; (c) proprietary and confidential information, ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, software programs, software source documents, and formulae related to the current, future, and proposed products and services of each of the Parties, such as information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, and marketing plans; and (d) all other information that the Receiving Party knew, or reasonably should have known, was the Confidential Information of the Disclosing Party. The Customer Data and the provisions of this Agreement (including any additional or subsequent negotiations between the parties) shall be deemed to be Confidential Information.

12.2.    Exclusions.  Confidential Information shall not include information that (a) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the Receiving Party, (b) is or has been independently acquired or developed by the Receiving Party without use of the Disclosing Party's Confidential Information and without violating any of the confidentiality obligations in this Agreement, (c) was within the Receiving Party's possession prior to it being furnished to the Receiving Party by or on behalf of the Disclosing Party, or (d) is received from a source other than the Disclosing Party; provided that, in the case of (c) and (d) above, the source of such information was not known by the Receiving Party to be bound by a confidentiality obligation to the Disclosing Party or any other party with respect to such information.

12.3.    Obligation.  Each Receiving Party agrees that it will keep the Confidential Information of the Disclosing Party strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the Disclosing Party without the Disclosing Party's prior written consent, except to the extent expressly permitted by this Agreement or to perform its obligations under this Agreement; *provided*, *however*, that the Receiving Party may disclose the Confidential Information, or any portion thereof, under an obligation to maintain the confidentiality thereof (at least as protective as the terms of this Agreement), to its directors, officers, employees, legal and financial advisors, controlling persons and entities, and actual and prospective investors, acquirors and financing sources (and the Receiving Party shall be responsible for any use, misuse and/or disclosure by such individuals of the Confidential Information of the Disclosing Party).

[PAGE]



Each Receiving Party shall use the same degree of care to avoid disclosure or use of the Disclosing Party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees and independent contractors have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

12.4.    Disclosure Request.  Notwithstanding the above, the Receiving Party may disclose certain Confidential Information of the Disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other Governmental Authority having jurisdiction, *provided that* the Receiving Party provides the Disclosing Party with reasonable prior written notice of such disclosure and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation required, or for which the order was issued.

13.    **Representations and Warranties; Limitation of Liability**.

13.1.    Representation by MSE Parties.  Each MSE Party represents and warrants that: (i) it is a limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; (ii) it has all requisite limited liability company power and authority necessary to execute, enter into, deliver, carry out and perform all of its obligations pursuant to this Agreement; (iii) SeatGeek's use of such MSE Party's intellectual property in accordance with the terms of this Agreement does not and will not infringe or violate any patent, trademark, copyright, trade secret, or other proprietary rights of any third party; (iv) it has the right to share with SeatGeek the Existing Ticketholder Data and SeatGeek's use of the Existing Ticketholder Data solely as directed by such MSE Party will not infringe or violate any federal, state, local, or foreign laws, rules, or regulations; (v) it has duly authorized the execution, delivery, and performance by it of this Agreement; (vi) this Agreement constitutes the legal, valid, and binding obligation of such MSE Party and is enforceable against such MSE Party in accordance with its terms; (vii) the execution, delivery, and performance by it of this Agreement does not and shall not conflict with or result in a breach of the terms, conditions, or provisions of any agreement, instrument, or document to which such MSE Party is a party or subject, including without limitation the League Rules (as of the Effective Date), or any applicable law, regulation, or other legal requirement; and (viii) it will comply with all applicable federal, state, local and foreign laws, rules, and regulations in performing its obligations under this Agreement.

13.2.    Representation by SeatGeek.  SeatGeek represents and warrants that: (i) it is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization; (ii) it has all requisite corporate power and authority necessary to execute, enter into, deliver, and carry out and perform all of its obligations pursuant to this Agreement; (iii) it has duly authorized the execution, delivery, and performance by it of this Agreement; (iv) the SeatGeek Services and SeatGeek Platform, or any component thereof, and/or the use thereof by the MSE Parties in accordance with the terms of this Agreement, does not and will not infringe or violate any patent, trademark, copyright, trade secret, or other proprietary rights of any third party; (v) during the Term, the SeatGeek Platform shall perform substantially in compliance with SeatGeek's specifications, the Agreement and under normal use and circumstances; (vi) SeatGeek's use of the Existing Ticketholder Data (except such use as solely directed by the MSE Parties) or Customer Data will not infringe or violate any federal, state, local or foreign laws, rules or regulations; (vii) this Agreement constitutes the legal, valid, and binding obligation of SeatGeek and is enforceable against SeatGeek in accordance with its terms; (viii) the execution, delivery,

[PAGE]

    *Confidential*

and performance of this Agreement by it does not and shall not conflict with or result in a breach of the terms, conditions, or provisions of any agreement, instrument, or document to which SeatGeek is a party or is subject, or any applicable law, regulation or other legal requirement; and (ix) it will comply with all applicable federal, state, local and foreign laws, rules, and regulations in performing its obligations under this Agreement.

13.3.    No Additional Representations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, REPRESENTATIONS, OR COVENANTS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. SEATGEEK MAKES NO REPRESENTATIONS REGARDING THE BENEFITS TO MSE PARTIES FROM THE SEATGEEK PLATFORM, OR THAT THE SEATGEEK PLATFORM WILL BE ERROR-FREE, ALWAYS AVAILABLE OR OPERATE WITHOUT LOSS OR CORRUPTION OF DATA OR TECHNICAL MALFUNCTION.

13.4.    Limitation of Liability.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES, WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE OR A PARTY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.  IN NO EVENT WILL EITHER PARTY'S MAXIMUM AGGREGATE LIABILITY FOR DAMAGES HEREUNDER AND UNDER THE SPONSORSHIP AGREEMENT EXCEED THE SPONSORSHIP FEES PAID BY SEATGEEK PURSUANT TO THE SPONSORSHIP AGREEMENT IN RESPECT OF THE TWELVE (12) MONTH PERIOD PRIOR TO THE DATE THE LIABILITY FIRST AROSE.  THE FOREGOING LIMITATIONS ON LIABILITY SET FORTH IN THIS SECTION 13.4 SHALL NOT APPLY TO LIABILITIES TO THIRD PARTIES COVERED BY AN INDEMNIFICATION OBLIGATION SET FORTH IN THIS AGREEMENT.

14.    **Indemnification; Insurance**.

14.1.    By MSE Parties.  MSE Parties shall indemnify, defend and hold harmless SeatGeek and its members, parents, subsidiaries, affiliates, and its and their officers, directors, employees and agents and their successors and assigns (the "SeatGeek Indemnitees") from and against any and all third party claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, the SeatGeek Indemnitees arising from: (i) any breach or alleged breach by MSE Parties or any of their respective officers, directors, employees, Additional API Licensees or agents of any representation, warranty, covenant or term in this Agreement; (ii) the MSE Parties' use of the SeatGeek Platform in breach of this Agreement; (iii) the negligence or willful misconduct of the MSE Parties or any of its employees, agents, contractors or representatives in connection with the performance by the MSE Parties of their obligations under this Agreement; (iv) except to the extent arising from the negligence or willful misconduct of SeatGeek, bodily injury (including death) occurring at any Event; (v) except to the extent arising from the negligence or willful misconduct of SeatGeek, the failure of any scheduled Event to occur or an Event to occur in the manner advertised or promoted; (vi) any claim where it is alleged that the use by SeatGeek of any MSE Parties intellectual property, solely as directed by MSE Parties, infringes on the patent, trademark, copyright, trade secret or other proprietary rights of any third party; and (vii) any amounts, including taxes, interest and penalties, assessed against SeatGeek by a Governmental Authority that are the obligation of the MSE Parties.

14.2.    By SeatGeek.  SeatGeek shall indemnify, defend and hold harmless the MSE Parties and its members, parents, subsidiaries, affiliates, and its and their officers, directors,

[PAGE]



employees and agents and their permitted successors and assigns (the "MSE Parties Indemnitees") from and against any and all third party claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, the MSE Parties Indemnitees arising from: (i) any breach or alleged breach by SeatGeek or any of its officers, directors, employees or agents of any representation, warranty, covenant or term in this Agreement; (ii) any claim that SeatGeek does not have the right and authority to enter into and perform its obligations under this Agreement or that entering into this Agreement violates any other agreement to which SeatGeek is a party; (iii) any claim where it is alleged that the use by the MSE Parties of any SeatGeek intellectual property, solely as directed by SeatGeek, infringes on the patent, trademark, copyright, trade secret or other proprietary rights of any third party; (iv) any amounts, including taxes, interest and penalties, assessed against the MSE Parties by a Governmental Authority that are the obligation of SeatGeek; or (v) the negligence or willful misconduct of SeatGeek or any of its employees, agents, contractors or representatives in connection with the performance by SeatGeek of its obligations under this Agreement.

    14.3.    <u>Infringement</u>. If any portion of the SeatGeek Platform becomes, or in SeatGeek's opinion is likely to become, the subject of a claim of infringement, SeatGeek may, at SeatGeek's option: (a) procure for MSE Parties the right to continue using the SeatGeek Platform; (b) replace the SeatGeek Platform with non-infringing software or services which do not materially impair the functionality of the SeatGeek Platform; (c) modify the SeatGeek Platform so that it becomes non-infringing; or (d) terminate this Agreement and, upon such termination, MSE Parties will immediately cease all use of the SeatGeek Platform. Notwithstanding the foregoing, SeatGeek shall have no obligation under this Agreement with respect to any infringement claim based upon (1) any use of the SeatGeek Platform not in accordance with this Agreement; (2) any use of the SeatGeek Platform in combination with other products, equipment, software or data not supplied or approved by SeatGeek; or (3) any modification of the SeatGeek Platform by any person other than SeatGeek or its authorized agents. Section 14.2. and this Section 14.3. state the sole and exclusive remedy of the MSE Parties and the entire liability of SeatGeek or any of its officers, directors, employees, shareholders, contractors or representatives for infringement claims and actions.

    14.4.    <u>Process for Indemnification</u>. The indemnified Party will provide the indemnitor with prompt notice of any claim and provide copies of all related documentation (provided that the failure to promptly notify shall not have any effect on an indemnitor's obligations unless the indemnitor can demonstrate that the failure to provide prompt notice materially and adversely prejudiced the legal rights of the indemnitor) and at the indemnitor's expense, provide assistance reasonably necessary to defend such claim. The indemnitor will control defense of the claim and will not enter into a settlement that would result in liability to the indemnified Party without the indemnified Party's prior written consent, which shall not be unreasonably withheld or delayed.

    14.5.    <u>Insurance</u>. Each Party agrees to procure and maintain in force with duly licensed insurance carriers the following occurrence-based insurance for the duration of this Agreement: (i) workers compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by SeatGeek hereunder; and (ii) a commercial general liability policy including advertising, injury coverage with limits of not less than One Million U.S. Dollars ($1,000,000.00) per occurrence and Two Million U.S. Dollars ($2,000,000) in the aggregate. Each Party shall provide the other Party with reasonable prior written notice of any cancellation or material adverse amendment of such coverage.

    15.    **Termination**.

[PAGE]



*Confidential*

15.1.    <u>Event of Default</u>.

15.1.1.    <u>Default by SeatGeek</u>.  The occurrence of the following shall be deemed a default by SeatGeek (a "<u>SeatGeek Default</u>"): SeatGeek's failure to perform or comply with any material term or condition of this Agreement and such failure of performance or compliance continues for a period of thirty (30) days upon SeatGeek's receipt of notice from the MSE Parties specifying such failure and demanding that it be corrected; *provided*, *however*, that if SeatGeek has taken reasonable steps to cure such failure within such thirty (30) day period, but such failure is of a type or character which is not reasonably susceptible to cure within such thirty (30) day period, but is capable of cure by SeatGeek using commercially reasonable efforts, SeatGeek shall have such additional time as may be necessary in order to effectuate such cure.

15.1.2.    <u>The MSE Parties' Remedies</u>.  Upon the occurrence of a SeatGeek Default, the MSE Parties may, subject and subordinate to Section 16.5, do any one or more of the following: (i) enforce the specific remedies provided for in this Agreement; (ii) recover all damages provided by law or in equity; (iii) exercise any other right or remedy available at law or in equity, including obtaining an injunction or order of specific performance; (iv) suspend all Sponsorship Assets (as defined in the Sponsorship Agreement) to SeatGeek under this Agreement; and/or (v) terminate this Agreement.

15.1.3.    <u>Default by the MSE Parties</u>.  The occurrence of the following shall be deemed a default by the MSE Parties (each, a "<u>MSE Parties Default</u>"): the MSE Parties' failure to perform or comply with any material term or condition of this Agreement and such failure of performance or compliance continues for a period of thirty (30) days following the MSE Parties' receipt of notice from SeatGeek specifying such failure and demanding that it be corrected; *provided*, *however*, if the MSE Parties have taken reasonable steps to cure such failure within such thirty (30) day period, but such failure is of a type or character which is not reasonably susceptible to cure within such thirty (30) day period, but would be capable of cure by the MSE Parties using reasonable efforts, the MSE Parties shall have such additional time as may be necessary in order to effectuate such cure.

15.1.4.    <u>SeatGeek's Remedies</u>.  Upon the occurrence of a MSE Parties Default, SeatGeek may, subject and subordinate to Section 16.5, do any one or more of the following: (i) enforce the specific remedies provided for in this Agreement; (ii) recover all damages provided by law or in equity; (iii) exercise any other right or remedy available at law or in equity, including seeking an injunction or order of specific performance; (iv) suspend MSE Parties' access to the SeatGeek Platform under this Agreement, or any and all of MSE Parties' users' access to the SeatGeek Platform; and/or (v) terminate this Agreement.

15.2.    <u>Termination for Infringement</u>.  This Agreement may be terminated by SeatGeek in the event any act by the MSE Parties infringes upon any SeatGeek (or SeatGeek licensor) intellectual property or other proprietary right, including, without limitation, any copyright, license right or trade secret right, and MSE Parties fail to refrain from so acting within ten (10) business days' written notice from SeatGeek.

15.3.    <u>Suspension</u>.  In addition to SeatGeek's rights pursuant to and in accordance with Section 15.1.4(iv), at any time during the Term, SeatGeek may, if there is a reasonable threat to the technical security of the SeatGeek Platform, SeatGeek may, immediately upon written notice to MSE Parties (email to suffice), suspend the MSE Parties' access to the SeatGeek Platform under this Agreement, or any and all of MSE Parties' users' access to the SeatGeek Platform.

[PAGE]



*Confidential*

15.4. <u>Return of Confidential Information</u>.  Upon the effective date of any termination or expiration of this Agreement each Receiving Party shall return, or at the Disclosing Party's request, destroy all copies of the Disclosing Party's Confidential Information, and all other property belonging to and/or received from the Disclosing Party; provided, that, nothing in this Section 15.4. shall be construed to prohibit a Receiving Party from retaining such Confidential Information to the extent required by law, any applicable rule of any Governmental Authority, or its document retention policy, it being agreed that any such Confidential Information shall continue to be subject to the restrictions on use and obligation for confidential treatment contained herein (which shall survive for so long as copies of any Confidential Information remain).

15.5. <u>Non-Exclusive Remedies</u>.  No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations set forth herein.

16. **Miscellaneous.**

16.1. <u>Governing Law; Dispute Resolution</u>.  This Agreement and any action related thereto will be governed, controlled, interpreted, and defined by and under the laws of the State of New York, without giving effect to any conflicts of laws principles that require the application of the law of a different state.  The Parties agree to attempt in good faith to resolve all claims, disputes and controversies of any nature relating to this Agreement or the relationship of the Parties (collectively "<u>Dispute</u>") promptly by negotiation between their authorized executives, at a mutually agreeable time and location. If any Dispute has not been resolved by negotiation as described above within sixty (60) days from the commencement of the negotiations, the Parties agree that prior to attempting to resolve the Dispute by arbitration or litigation, they shall attempt to settle the Dispute by non-binding, confidential mediation in a mutually agreed upon location by a mutually acceptable mediator. The terms of this Section will not prevent either Party from seeking appropriate remedies, including without limitation injunctive relief, to protect its Confidential Information and/or intellectual property interests.

16.2. <u>Entire Agreement; Modification</u>.  This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments.  No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the Party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A Party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

16.3. <u>Assignment</u>.  Neither Party may assign or transfer any rights or obligations under this Agreement, by operation of law or otherwise, without the prior written consent of the other Party and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void, except that (i) a Party may assign this Agreement without such consent to any subsidiary or affiliate of such Party; and (ii) a Party may, upon reasonable written notice to the other Party, assign this Agreement without such consent to its successor in interest by way of merger, acquisition or sale of its assets (in each case, the acquiring company may be referred to as a "<u>Successor In Interest</u>"). The terms of this Agreement shall inure to and will be binding upon assignees.

16.4. <u>Relationship of the Parties</u>.  Each Party is an independent contractor and not an agent or partner of, or joint venturer with, the other Party for any purpose other than as set forth

[PAGE]



*Confidential*

in this Agreement. Neither Party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other Party.

16.5.　　Force Majeure.　No Party shall be liable for damages of any kind for its failure to perform due to force majeure events, including without limitation, fire, storm, flood, power outages, pandemic, epidemic, earthquake, explosion, war, terrorist actions, accidents, public disorders, sabotage, lockouts, labor disputes, labor shortages, government shutdowns, strikes, riots, or acts of God (a "Force Majeure Event"). The Party claiming a Force Majeure Event will use reasonable efforts to minimize the effects of the Force Majeure Event. In the event a Force Majeure Event results in the cancellation or postponement of an Event or the continuation of Events without an audience, all sponsorship obligations of SeatGeek (including, without limitation, the obligation to pay sponsorship fees) shall be suspended until the Force Majeure Event has ceased. In the event a Force Majeure Event results in the continuation of Events with limited capacity, all sponsorship obligations of SeatGeek (including, without limitation, the obligation to pay sponsorship fees) shall be reduced on a pro rata basis based on the reduction in capacity. In order to make up for any of SeatGeek sponsorship rights that could not be exercised as a result of a cancellation of an Event, SeatGeek and MSE Parties shall negotiate in good faith a mutually satisfactory arrangement of comparable value by means of rescheduling, substitution, alternative performance, or similar means (taking into account SeatGeek's lost revenue relating to the sale of tickets). If SeatGeek and MSE Parties, negotiating in good faith, are unable to reach a mutually satisfactory arrangement of comparable value by means of rescheduling, substitution, alternative performance or similar means, SeatGeek and MSE Parties shall negotiate, in good faith, an equitable adjustment in the SeatGeek fees or an equitable reimbursement by MSE Parties.

16.6.　　Severability.　If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the Parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

16.7.　　Notices.　Any notices required to be given under this Agreement must be sent to each Party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each Party in writing from time to time, by commercial overnight courier.　Where noted, notices sent by email shall be sufficient to fulfill the notice obligation set forth in this Section 16.7.

16.8.　　Binding Agreement/Counterparts.　　The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective permitted successors and assigns; *provided, however*, that this Agreement shall not be binding until executed by each of the Parties.　This Agreement may be executed in multiple counterparts, and by commonly utilized electronic means (e.g., PDF) which when taken together constitute a single instrument.

16.9.　　Legal Review.　Each of the Parties has had the opportunity to have its legal counsel review this Agreement on its behalf.　If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the Parties.　The Parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

[PAGE]



16.10.   <u>Press Release; MSE Parties Listings</u>.  The Parties will mutually agree on a public press release describing the business relationship between the Parties, to be issued within ten (10) days following the Effective Date.  Subject to the terms of the Sponsorship Agreement, MSE Parties' execution of this Agreement indicates approval for Teams to be listed as a SeatGeek client in digital, online and offline marketing collateral, including monthly newsletters for distribution to event industry clients, in product boilerplate information, and in future releases about SeatGeek products and services for distribution to trade and consumer media, in each case.

16.11.   <u>Survival of Terms</u>.   Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to Customer Data, limitations on liability, ownership of intellectual property, indemnification, Confidential Information, governing law, and survival, shall survive any termination or expiration of this Agreement and continue in full force and effect.

[signature page follows]

[PAGE]



*Confidential*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

Accepted and agreed by:


**LINCOLN HOLDINGS LLC**
**d/b/a Monumental Sports and**
**Entertainment**

**[ADDITIONAL PARTIES]**

By: _____
    Name:
    Title:
    Date:

By: _____
    Name:
    Title:
    Date:


**SEATGEEK, INC.**


By: _____
    Name:
    Title:
    Date:


[PAGE]



*Confidential*

### APPENDIX A

### SPONSORSHIP TERMS

### [In Discussion]

1.1.    <u>Grant of Rights</u>.  MSE Parties hereby grant to SeatGeek for the Term of this Agreement, and SeatGeek hereby accepts, the non-exclusive (except as otherwise set forth herein), non-transferable (except as otherwise set forth herein), non-sublicensable (except as otherwise set forth herein) and limited right to exploit the Rights set forth in this Agreement in connection with the activation of its rights under this Agreement.  Except as otherwise set forth herein, Client shall not cause or permit:  (x) any third party to activate in SeatGeek's Commercial Category; and/or (y) any Competitor to use any Team marks or other intellectual property, and/or to use and/or activate any rights in respect of any Team- and/or Facility-related advertising, promotional or sponsorship inventory.

1.2.    <u>Sponsorship Rights and Fees</u>.  In consideration of receiving the Sponsorship Rights set forth below, SeatGeek shall pay the Sponsorship Fee, per Contract Year.  The parties shall work together in good faith to ensure that the full Sponsorship Fee value is recognized by SeatGeek and shall mutually agree upon all Sponsorship Assets no later than the Effective Date.

| Contract Year | Sponsorship Fee |
|---|---|
| 1 | TBD |
| 2 | TBD |
| 3 | TBD |
| 4 | TBD |
| 5 | TBD |
| 6 | TBD |
| 7 | TBD |
| 8 | TBD |
| 9 | TBD |
| 10 | TBD |

1.3.    <u>Sponsorship Meeting</u>.  With respect to all of the mutually agreed upon Sponsorship Assets, the parties agree to meet once per Contract Year to recapitulate the preceding Contract Year's activations and discuss the following Contract Year's activations, which shall include planning for all Sponsorship Rights that SeatGeek elects to activate.  In connection with each such meeting, subject to the mutual written agreement of the parties, MSE Parties shall provide and SeatGeek shall receive for the following year certain substitute Sponsorship assets, providing SeatGeek with reasonably equivalent value to the value of the applicable year's Sponsorship Fee, which will include, but not be limited to, additional Sponsorship assets reasonably equivalent to the annual Sponsorship Fee increase.

1.4.    <u>Invoice and Payment Terms</u>. Subject to Client's continued material compliance with the terms of this Agreement, SeatGeek shall pay the annual Sponsorship Fee in four (4) equal installments on the Installment Dates of each Contract Year beginning on the Sponsorship Fee Initial Payment Date. Client shall inform SeatGeek in writing of invoice details at least ninety (90) days prior to the Sponsorship Fee Installment Dates. "Installment Dates" shall mean [_____]. The "Sponsorship Fee Initial Payment Date" shall mean [_____, 2021].

1.5.    <u>Rights and Assets</u>. [TBD],

[PAGE]

 SeatGeek

*Confidential*

## APPENDIX B

## TICKET FEES AND TERMS

In consideration for the MSE Parties' use of the SeatGeek Platform, the Parties shall add, collect and retain the fees as set forth herein.

Primary Ticketing

For all online Sales of individual Event Primary Tickets (including ticket bundles, i.e., "Family 4-Packs, etc.), SeatGeek will retain a per Ticket fee of eighteen percent (18%) (the "Ticket Fee").

For the avoidance of doubt, suite standing room only Tickets shall be subject to a Ticket Fee.

SeatGeek shall not collect a Ticket Fee for a sale at the Facility Box Office.

With respect to Sales of Primary Tickets to Team Events, SeatGeek shall remit to MSE Parties [＿＿＿＿] percent (＿＿%) of net Primary Ticket fee revenue actually received by SeatGeek ("Primary Fee Revenue").

With respect to Sales of Primary Tickets to all non-Team Events, SeatGeek shall remit to MSE Parties [＿＿＿＿] percent (＿＿%) of net Primary Fee Revenue.

For purposes of this "Primary Ticketing" section of Appendix B, "net" means net of all direct expenses relating to the Sale of such Primary Tickets, including credit card processing fees, taxes, and chargeback costs.

Unless approved by MSE Parties in writing, SeatGeek shall not add or apply any fees or charges other than the Ticket Fees set forth above, credit card processing fees and any other applicable taxes (e.g., there will be no additional delivery or processing charges). The MSE Parties shall be solely responsible for all taxes due in connection with the Sale of Primary Tickets.

Notwithstanding anything to the contrary contained herein, the Ticket Fee for Primary Ticket Sales shall not apply to season Tickets, suites, ticket plans, renewals, free events, playoff plan packages, and group Sales.

MSE Parties may add additional fees for a particular Event (a "MSE Event Fee"), which SeatGeek shall add to the total price charged to a consumer and remit such MSE Event Fee to MSE Parties.

Secondary Ticketing

SeatGeek will set buyer and seller fees at its sole discretion for all Sales of Secondary Tickets (the "Secondary Fee Revenue").

With respect to Sales of Secondary Tickets, SeatGeek shall remit to MSE Parties [＿＿＿＿] percent (＿＿%) of net Secondary Fee Revenue actually received by SeatGeek..

[PAGE]



For purposes of this "Secondary Ticketing" section of <u>Appendix B</u>, "net" means net of all direct expenses relating to the Sale of such Secondary Tickets, including credit card processing fees, taxes, and chargeback costs.

## Refunds

Notwithstanding anything to the contrary contained in this Agreement, in the event SeatGeek is required to or elects to refund any Primary and/or Secondary Ticket fee revenue, including refunds in the form of credit issuances, MSE Parties agree to refund to SeatGeek such Primary and/or Secondary Ticket fee revenue actually received by MSE Parties.  Upon MSE Parties' reasonable request, SeatGeek will provide reasonable evidence of the basis for such refund. SeatGeek shall have the right to withhold the amount of such refunds owed to SeatGeek from subsequent Primary and/or Secondary Ticket Fee revenue payments.

## Display of Inventory on SeatGeek Platform

For all traffic to MSE Parties and third-party event pages originating from channels owned and operated by MSE Parties channels (e.g., Team website), SeatGeek will provide the option to (i) display only primary inventory upon landing, with a toggle available to display resale inventory and (ii) turn off SeatGeek's proprietary "Deal Score" feature.

For all direct traffic to Team and third-party event pages or traffic originating from SeatGeek marketing, SeatGeek will display primary and resale inventory on a co-mingled bases.

[PAGE]



*Confidential*

## APPENDIX C

## IMPLEMENTATION AND TRAINING

**Weeks 1 - 4**
- Day 1 - 20: Sales Diligence

**Week 5**
- Day 21 : External Kickoff
- Day 21 - 25: Project Plan and Requirements Review
- Day 21 - 33: Venue Build
- Day 25 - 29: Implementation and Configuration Review Sessions

**Week 6**
- Day 26: Training strategy and schedule confirmed with MSE Parties
- Day 26: Legacy Data Received from MSE Parties
- Day 26 - 38: SG - TR1 Data Conversion Work
- Day 27: SRO Back office testing begins
- Day 30: SRO production environment available for configuration

**Week 7**
- Day 31 - 35: MSE Parties SRO installation sessions

**Week 8**
- Day 36 - 55: Super User training
- Day 38: SG Delivers Data Conversion - TR1
- Day 38-50: TR1 - Data Checking by MSE Parties

**Week 9**
- Day 41 - 71: SRO - Back Office Configuration

**Week 10**
- Day 50: Receive TR2 Legacy Data from MSE Parties
- Day 50: Kickoff Access Control Configuration
- Day 50 - 57: SG - TR2 Data Conversion work
- Day 50 - 70: Hardware Setup and Installation
- Day 50 - 70: Fan Facing and Online Sales Build

**Week 12**
- Day 57: SG Delivers Data Conversion - TR2
- Day 57 - 68: TR2 Data Checking by MSE Parties
- Day 58 - 71: Payments Setup and Testing

[PAGE]

**SeatGeek**

*Confidential*

**Week 13**
- Day 64 - 72: Sales User Training
- Day 68: TR2 Data Checking due by MSE Parties
- Day 69: Final legacy data due from MSE Parties

**Week 14**
- Day 70: Final data inserted into production, signed off and validated by MSE Parties
- Day 74: Payments and Back Office Go-Live

**Week 17+**
- Day 83: Online Sales Go-Live
- Day 113 - 119: Access Control - Hardware Testing and Validation
- Day 120: First Event

[PAGE]

**SeatGeek**

*Confidential*

### APPENDIX D

### THIRD PARTY EVENTS

Provided MSE Parties provide SeatGeek with written notice for each third party Event (as applicable, "Turnaround Time") prior to the commencement of any Sales activity in connection with a third party Event, SeatGeek shall provide commercially reasonable support for such third party Event as set forth below.

1. **Categories of Events**
    1.1. **Event Type: Basic Event** (e.g., general admission Events)
        1.1.1. Link existing SRO event to SeatGeek to place on-Sale on SeatGeek.com. Provide Venue/ MSE Parties with direct Event URL.
        1.1.2. Application of existing Venue map (except for general admission Events)
        1.1.3. Creative uses standard imagery
        1.1.4. Ability to manage Ticket restrictions (transfer/re-Sale/barcodes)
        1.1.5. No pre-Sale configurations
        1.1.6. No mobile Ticket customizations
        1.1.7. No Distribution Partners configuration or support
        1.1.8. Ability for Facility Box Office or promoter to independently manage any price changes with access to SeatGeek interface
        1.1.9. **Turnaround Time:** three (3) days to launch from the time SeatGeek receives all Event build/details

    1.2. **Silver Event** (e.g., mid-tier Events with customizations)
        1.2.1. Link existing SRO event to SeatGeek to place on-Sale on SeatGeek.com. Provide Venue/MSE Parties with direct event URL
        1.2.2. Application of custom Venue map
        1.2.3. Creation and application of custom performer imagery
        1.2.4. Ability to manage Ticket restrictions (transfer/re-Sale/barcodes)
        1.2.5. Ability to offer pre-Sales
        1.2.6. Mobile Ticket customizations
        1.2.7. Distribution Partner configuration and ancillary Event setup support (e.g., parking and suites)
        1.2.8. Ability for Facility Box Office or promoter to independently manage any price changes with access to SeatGeek interface
        1.2.9. Production and upload of unique third party Event assets for each Event by SeatGeek's creative and mapping teams; *provided, however,* the Venue shall send the following at least three (3) days prior to an Event on Sale:
            1.2.9.1. A high-resolution logo in 'png' format with transparent background [performer image + marketing-use]
            1.2.9.2. A logo in one of the following formats:
                1.2.9.2.1. AI
                1.2.9.2.2. SVG [map on SeatGeek Event page]
        1.2.10. **Turnaround Time:** seven (7) days to launch from the time SeatGeek receives all Event build/details

    1.3. **Platinum Event** (e.g., high traffic Events with on-Sale queuing, such as major concerts)
        1.3.1. Inclusion of all features of Silver Event listed above, plus:

[PAGE]

**DX-1512.0032**



*Confidential*

      1.3.1.1.    Ability to support customized/complex pre-Sales (e.g.,: credit card pre-Sales, fan clubs with unique access codes, etc.)

      1.3.1.2.    Ability to set prime or VIP seating displays

    1.3.2.    **Turnaround Time:** fourteen (14) days to launch from the time SeatGeek receives all Event build/details

[PAGE]

CONFIDENTIAL
Confidential

MONUMENTAL-DCAG-0000249

**DX-1512.0033**



*Confidential*

## APPENDIX E

## INCIDENT MANAGEMENT

"Service Interruption" shall mean any instance where the operation of the SeatGeek Platform is impaired, degraded or completely unavailable.

1. The following severities are used for classifying Service Interruptions:

| Priority | Description |
|---|---|
| **Priority 1 (P1) – Critical** | The SeatGeek Platform is down, completely unavailable or inaccessible. |
| **Priority 2 (P2) – High** | The operation of the SeatGeek Platform is significantly impaired or interrupted. Significant functions are non-functional. |
| **Priority 3 (P3) – Medium** | Minor interruptions or disruptions not causing significant difficulty (e.g., bug, error). |
| **Priority 4 (P4) – Low** | Questions or requests; No effect on system function |

2. The Managed Services and/or Support Team shall assign the appropriate severity level to each Service Interruption in accordance with the significance of the problem and the impact on MSE Parties' ability to use the SeatGeek Platform.

3. The MSE Parties will report any Service Interruptions to SeatGeek via the following channels, depending on the phase of the client relationship:

   a. Implementation Period: If the issue prompts urgency, MSE Parties should contact (text, email, call) their assigned Project Manager.

   b. Support Period: MSE Parties shall assign between one (1) and ten (10) designated contacts (each, a "Designated Contact") to serve as a liaison between the MSE Parties and SeatGeek's product support team ("Product Support"). The primary responsibilities of a Designated Contact shall be to (a) submit cases on behalf of MSE Parties; (b) serve as a central point of contact for the MSE Parties' authorized users (if needed); and (c) obtain necessary knowledge of the SeatGeek Platform in order to be able to assist, as needed, in analyzing and testing resolutions to technical issues. Designated Representatives should log a case in Salesforce Service Cloud. If the issue prompts further urgency, such Designated Representative should call the SeatGeek support help desk at 1 (888) 618-1319 ("Help Desk"). When contacting the Help Desk, MSE Parties must provide the following:

      i. Name and capacity of caller

[PAGE]

**SeatGeek**

*Confidential*

    ii.    Company name
    iii.   Telephone number
    iv.   Email address
    v.    Date and time of fault occurrence(s)
    vi.   Description of the problem

"Properly Logged Request" shall mean a request for support made by MSE Parties to the Project Manager, in Salesforce Service Cloud or via the Help Desk, as applicable, with the information above.

Designated Representatives may also use the forms of contact below in order to reach out to Product Support:

- Email: [ HYPERLINK "mailto:product-support@seatgeek.com" \h ]
- Support Site: [ HYPERLINK "https://support.enterprise.seatgeek.com" \h ]
- Chat via the Support Community

4. SeatGeek shall use commercially reasonable efforts to respond to Service Interruptions that have been reported by the MSE Parties within the following time frames; provided, however, in the event of sustained Service Interruptions at the P1 and P2 Priority levels, the Parties shall mutually agree on service credits to be used towards professional services, for failure to achieve the below Targeted Response Times, such service credits to be used within one calendar of the issuance of such credits:

| Priority | On-Call Hours | Targeted Response Time |
|----------|---------------|------------------------|
| P1 | Normal Business Hours and Critical/High Issue Hours | 30 minutes |
| P2 | Normal Business Hours and Critical/High Issue Hours | 2 hours |
| P3 | Normal Business Hours | 6 hours |
| P4 | Normal Business Hours | 1 day |

    a.   "Targeted Response Time" shall mean the targeted time frame for a member of the Managed Services and Support Team to first respond to a properly logged request. When applicable, responding by commenting in the support ticket system shall be considered a response by SeatGeek.

5. "On-Call Hours" shall mean the time frame during which the Managed Services and Support Team is available to respond to Service Interruptions and other escalations. On-Call Hours shall be classified as follows:

| On-Call Hours | Availability (local time for the venue) |
|---------------|------------------------------------------|

[PAGE]



*Confidential*

| Normal Business Hours | Monday - Friday: 24/7 |
|---|---|
| Critical/High Issue Hours | Saturday - Sunday and Regionally Observed Holidays: 24/7 |

During On-Call Hours, SeatGeek shall make all commercially reasonable efforts to respond within the Targeted Response Time based upon the priority level of a request. At all other times, SeatGeek shall respond as promptly as possible.

6. For an event to be recognized as a Service Interruption, it must be first acknowledged and confirmed as such by the Managed Services and/or Support Team. No services will be provided with respect to Service Interruptions which have not been confirmed by SeatGeek (acting reasonably and in good faith) or which are attributable to Exclusions (as defined below).

7. All Service Interruptions confirmed by SeatGeek will be logged on SeatGeek's systems, indicating the time the problem was reported, details with respect to the reporting individual, the nature and description of the matter and the affected services. During the Support Phase, a unique ticket will be assigned to each reported matter and will be used as a reference number for all further communications regarding such matter.

8. SeatGeek shall determine whether the suspected error or reported defect is a confirmed Service Interruption or an Exclusion (as defined below). Following confirmation, SeatGeek shall commence remedial actions aimed at implementing a permanent solution designed to prevent the recurrence of the incident, or a workaround that provides a temporary procedural or process change which avoids the problem or reduces the impact of the problem until such time that a permanent solution is available or reduces the severity of the problem to a lower severity level.

9. If the suspected interruption is determined by SeatGeek to be an Exclusion, MSE Parties may request that SeatGeek dedicate time and resources to further investigate the unconfirmed interruption, provided, however, if SeatGeek elects to do so, MSE Parties shall be charged for such services and will be charged per the rates provided by SeatGeek to MSE Parties prior to commencing any such services.

10. Notwithstanding anything herein to the contrary, the services provided by the Managed Services and Support Team do not include services requested in connection with errors or interruptions caused by or attributable to any of the following (each, an "Exclusion"):

   a. Use of the SeatGeek Platform in a manner for which it was not designated, or in a manner contrary to the terms of the Agreement or any documentation related to the Software.

   b. Negligent mishandling, improper use or misuse of the SeatGeek Platform.

   c. Installation, repair or attempted repair of the SeatGeek Platform by any party other than SeatGeek.

[PAGE]



*Confidential*

d.  Any actual or attempted modification or change to the SeatGeek Platform not performed by SeatGeek.

e.  Errors or interruptions in which no fault is subsequently confirmed by SeatGeek, acting reasonably and in good faith, including such cases where the reported error cannot be reproduced by SeatGeek.

f.  MSE Parties resources or lack thereof, including third party software or hardware not provided by SeatGeek, or failure by MSE Parties to comply with its obligations under the Agreement.

g.  Acts or omissions of third party services providers, including without limitation the payment gateway and/or hosting services providers ("<u>Third Party Services</u>"). Notwithstanding anything herein to the contrary, SeatGeek does not give any warranties or representations with respect to the level, completeness, accuracy or fitness for purpose of any Third Party Services.

h.  Force Majeure Event or other circumstances beyond the reasonable control of SeatGeek.

i.  Unlawful attacks such as 'Denial of Service' (DOS) or other malicious attacks on the SeatGeek Platform.

j.  MSE Parties' failure to implement any Updates to the extent that the version of the SeatGeek Platform utilized by the MSE Parties at such time is no longer supportable.

k.  Failure by MSE Parties to respond to any required action plans provided by SeatGeek following submission of a support request.

[PAGE]

**DX-1512.0037**

**SeatGeek**

*Confidential*

## APPENDIX F

## MARKETING SERVICES

- <u>Analytics and Reporting</u>: Subject to the terms of the Agreement, MSE Parties shall have access to the standard modules of SeatGeek's analytics and reporting portal, Amplify.

The following sets forth the additional Amplify services and associated rates available to MSE Parties, provided any licensing costs shall be billed on a semi-annual basis:

| Services/Features | Cost to MSE Parties |
|---|---|
| **Amplify Access**<br>*Inclusive of Standard Events and Analytics modules*<br>• *Standard "Events" module includes My Events, Event Sales monitoring, Event heatmap and Event configuration*<br>• *Standard "Analytics" module includes 3 dashboards (Season Analytics, Game Analytics and 3PE Event Audit), tracking metrics and KPIs* | $0 for the first 40 licenses annually |

Should the MSE Parties require additional service/features to those included above, add-ons are available at the following rates:

| Services/Features | Cost to MSE Parties |
|---|---|
| **Additional Amplify Events Licenses**<br>*Inclusive of Standard Events module* | $0 per additional MSE Party or affiliated promoter license |
| **Additional Amplify Analytics Licenses**<br>*Inclusive of Standard Analytics module* | $1,500 per year for each additional MSE Party or affiliated promoter license |
| **Custom Reports & Dashboards**<br>*MSE Parties or promoter can request custom dashboards, which require scoping & development from SeatGeek* | $100 per hour of SeatGeek resourcing |
| **Templated Dashboards**<br>*Additional templated dashboards on top of the provisioned standard dashboard templates can be added to Amplify instances* | $600 per additional dashboard |

Subject to the terms of the Agreement, SeatGeek shall make reasonable commercial efforts to provide the MSE Parties with following services:

- <u>Database Marketing</u>: Database marketing (e.g., e-mail, push notification, in-app promotions) to promote Events

- <u>Performance Marketing</u>: Search engine optimization (SEO), search engine marketing (SEM), and other performance marketing efforts

[PAGE]

**DX-1512.0038**

 SeatGeek

- <u>Partner Marketing Manager</u>: SeatGeek will assign a marketing manager to help the MSE Parties use marketing analytics and business intelligence tools

- <u>Strategic Account Manager</u>: SeatGeek will assign a Strategic Account Manager to support relevant Ticket Sales and strategy workflows

- <u>Support Specialist</u>: SeatGeek will assign a support specialist to assist with ticket operations workflows (including technical consultation and advice via telephone, email or a web app/portal on the use of the SeatGeek Platform; on-call incident management support; and ongoing maintenance related to version upgrades) and such support specialist will be solely dedicated to the MSE Parties' business during the first and second Contract Years

- <u>Partner-minded Customer Service</u>: In-house Event experts to handle in-bound customer inquiries related to ticketing

- <u>Data Management</u>:

  - SeatGeek will assign a data engineer (or similarly titled person) to assist with the MSE Parties' data management needs; and

  - SeatGeek will provide access to the SRO data warehouse to MSE Parties and approved third parties for all fields available in SeatGeek's analytics. Subject to applicable laws, rules, regulations and applicable privacy policies, MSE Parties (or approved third parties) may leverage data to bolster existing customer records stored in external databases owned, licensed, and maintained by the MSE Parties or approved third parties.

[PAGE]